IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ANTHONY CANTRELL,                        )
    Plaintiff,                           )
                              )
                              )
         v.                                )          Civil No. 3:16cv939 (MHL)
                              )
NANCY A. BERRYHILL,                       )
Acting Commissioner of Social Security,   )
    Defendant.                           )
_____)

## REPORT AND RECOMMENDATION

On May 7, 2013, Anthony Cantrell ("Plaintiff") applied for Social Security Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from depression, anxiety, inability to perform minimal tasks and other mental illness, with an alleged onset date of December 1, 2012. The Social Security Administration ("SSA" or "Agency") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in (1) affording little weight to the opinion of the consultative examiner and to Plaintiff's Global Assessment of Functioning ("GAF") scores; (2) failing to conduct a proper *Craig* analysis; and, (3) failing to properly account for Plaintiff's anger in the residual functional capacity ("RFC"). (Mem. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 11) at 4-12.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for

summary judgment, rendering the matter ripe for review.[1]  For the reasons that follow, the Court

recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) and Motion to Remand

(ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be

GRANTED and that the final decision of the Commissioner be AFFIRMED.

I.    PROCEDURAL HISTORY

On May 7, 2013, Plaintiff filed an application for DIB with an alleged onset date of

December 1, 2012.  (R. at 163-64, 173.)  The SSA denied these claims initially on January 23,

2014, and again upon reconsideration on July 28, 2014.  (R. at 74-103.)  At Plaintiff's written

request, the ALJ held a hearing on December 10, 2015.  (R. at 50-70.)  On February 3, 2016, the

ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not

qualify as disabled under the Act, because he could perform other work existing in significant

numbers in the economy, including as a hand packer, material handler/mover and stock

clerk/order filler.  (R. at 30-44.)  On October 18, 2016, the Appeals Council denied Plaintiff's

request for review, rendering the ALJ's decision as the final decision of the Commissioner

subject to review by this Court.  (R. at 1-4.)

II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'"  *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

---

[1]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

2

337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the Agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step

3

one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the

ALJ asks whether the claimant's medical impairments meet the regulations' severity and

duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether

the medical impairments meet or equal an impairment listed in the regulations.

§ 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC,

accounting for the most that the claimant can do despite his physical and mental limitations.

§ 404.1545(a). At step four, the ALJ assesses whether the claimant can perform his past work

given his RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the

claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

### III.   THE ALJ'S DECISION

On December 10, 2015, the ALJ held a hearing during which Plaintiff (represented by

counsel) and a VE testified. (R. at 50-70.) On February 3, 2016, the ALJ issued a written

opinion, finding that Plaintiff did qualify as disabled under the Act. (R. at 30-44.)

The ALJ followed the five-step evaluation process established by the Social Security Act

in analyzing Plaintiff's disability claim. (R. at 30-44). At step one, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since the alleged onset date, December 1, 2012.

(R. at 32.) At step two, the ALJ determined that Plaintiff had the following severe impairments:

obesity; mood disorder; anxiety disorder; personality disorder; and, a history of substance abuse.

(R. at 32-33.) At step three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 33-35.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform medium work

with additional limitations. (R. at 35.) Plaintiff could never climb ladders, ropes or scaffolds,

4

but he could frequently perform other postural activities, including balancing and stooping. (R. at 35.)  The ALJ precluded Plaintiff from concentrated exposure to hazards, such as unprotected heights and dangerous moving machinery. (R. at 35.)  Plaintiff could perform simple, routine tasks, as well as detailed, complex tasks, while maintaining his concentration for two-hour segments. (R. at 35.)  Finally, Plaintiff could respond appropriately to change in a routine work setting, and he could have infrequent interaction with co-workers, supervisors and the public. (R. at 35.)  At step four, the ALJ found that Plaintiff could not perform his past relevant work. (R. at 43.)  At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 43-44.)  Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 44.)

## IV.    ANALYSIS

Plaintiff, forty-six years old at the time of this Report and Recommendation, previously worked as a highway inspector. (R. at 173, 178.)  He applied for Social Security Benefits, alleging disability from depression, anxiety, inability to perform minimum tasks and other mental illness, with an alleged onset date of December 1, 2012. (R. at 173, 177.)  Plaintiff's appeal to this Court alleges that the ALJ erred in (1) assigning too little weight to the opinion of the consultative examiner, James O'Keefe, Psy.D., and to Plaintiff's GAF scores; (2) failing to conduct a proper analysis of Plaintiff's symptoms; and, (3) failing to account for Plaintiff's anger in formulating his RFC. (Pl.'s Mem. at 4-12.)   For the reasons set forth below, the ALJ did not err in his decision.

### A.  Substantial Evidence Supports the ALJ's Assignment of Weight.

Plaintiff argues that the ALJ should have afforded more weight to the opinion of the consultative examiner, Dr. O'Keefe, and to Plaintiff's GAF scores. (Pl.'s Mem. at 4-6, 8-10.)  In

response, Defendant argues that substantial evidence supports the evaluation of the opinion evidence by the ALJ. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 12) at 9-15.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments, which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527. When the record contains a number of different medical opinions, including those from the claimant's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. §§ 404.1527(c). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to analyze properly the evidence involved. § 404.1527(c)(1)-(6).

### 1. Dr. O'Keefe's Opinion.

Plaintiff argues that the ALJ erred in affording little weight to the opinion of Dr. O'Keefe, the consultative examiner. (Pl.'s Mem. at 4-7). Specifically, Plaintiff alleges that the record supports Dr. O'Keefe's opinion that Plaintiff could not perform even simple, routine tasks nor complete a normal workday. (Pl.'s Mem. at 4-7.) Defendant responds that substantial evidence supports the ALJ's assignment of weight. (Def.'s Mem. at 9-12.) Defendant argues that Dr. O'Keefe examined Plaintiff only once — when Plaintiff had not taken his medications for approximately one month — and based his opinion largely on Plaintiff's subjective statements. (Def.'s Mem. at 9-10.)

6

On July 21, 2014, Dr. O'Keefe examined Plaintiff's mental status. (R. at 528.) Four days later, Dr. O'Keefe issued a psychology report detailing his observations, conclusions and opinions about Plaintiff's mental ability. (R. at 528-32.) In addition to his interview and examination of Plaintiff, Dr. O'Keefe also reviewed one Department of Disability Services field office report from March 2014, a discharge summary from Poplar Springs Hospital ("Poplar Springs") from August 2013, Plaintiff's treatment notes from Manjit K. Vohra, M.D., on January 7, 2014, and a discharge summary from Southside Community Services Board ("Southside CSB") from February 2014. (R. at 476, 528.)

Upon examination, Dr. O'Keefe described Plaintiff as overweight, depressed and distressed, with monotone speech and a "'poor me' attitude." (R. at 528.) Plaintiff had fair insight and judgment, and Dr. O'Keefe observed no evidence of a formal thought disorder. (R. at 528.) Plaintiff recounted being abused as a child by his father and brother. (R. at 529.) Plaintiff became depressed from his divorce, loss of visitation rights with his children, and the loss of his house and job. (R. at 529.) He had not taken "a number" of his medications for at least one month, because he could not afford them. (R. at 529.) Plaintiff claimed that he had two or three "violent outbursts" per day. (R. at 531.) Dr. O'Keefe found Plaintiff to be alert and fully oriented, and Plaintiff successfully completed tests assessing his recall, concentration, intermediate memory, fund of knowledge, judgment and reasoning ability. (R. at 530.) Dr. O'Keefe recorded diagnostic impressions of bipolar disorder, panic disorder, borderline personality disorder and mild alcohol abuse disorder. (R. at 531.)

Dr. O'Keefe opined that Plaintiff retained "the cognitive abilities to manage his finances in a reasonable way," but concluded that Plaintiff should have his mother as his payee because of his previous alcohol abuse and impulse spending. (R. at 531.) Dr. O'Keefe opined that Plaintiff

could not perform simple, routine tasks or complex, detailed activities. (R. at 532.) Despite

having the cognitive ability, Plaintiff lacked the emotional stability to perform in a work

environment. (R. at 532.) According to Dr. O'Keefe, Plaintiff's apathy and lethargy likely

prevented him from maintaining regular attendance at work. (R. at 532.) Plaintiff could accept

directions from supervisors, but his "regular anger outbursts" might preclude his ability to follow

instructions. (R. at 532.) Dr. O'Keefe opined that Plaintiff would struggle to interact with co-

workers and the public, because he became easily annoyed, had a limited tolerance for frustration

and could display passive-aggressive behavior. (R. at 532.)

   The ALJ afforded Dr. O'Keefe's opinion little weight, because it underestimated

Plaintiff's functional ability and conflicted with Plaintiff's education, psychiatric history and

clinical findings. (R. at 42.) The ALJ also noted that Plaintiff had not taken his medications for

a couple of weeks when he presented to Dr. O'Keefe. (R. at 42.)

   Objective medical evidence in the record supports the ALJ's decision to give little weight

to Dr. O'Keefe's opinion. On February 28, 2013, Plaintiff first presented to Karen Highlander,

F.N.P., for treatment of hypertension and anxiety. (R. at 446-48.) Nurse Highlander found

Plaintiff to be pleasant, alert, cooperative and in no acute distress. (R. at 447.) Nurse Highlander

altered Plaintiff's prescription for hypertension and refilled his anxiety medication, lorazepam.

(R. at 447.)

   On May 7, 2013, Plaintiff began counseling treatment with Elaine Cole, L.C.S.W., at

Southside CSB. (R. at 457.) Plaintiff indicated that he had been hospitalized in 2003 for

psychiatric treatment. (R. at 457.) His condition improved such that he stopped taking all

medications in 2005. (R. at 457.) During his visit with Ms. Cole, he complained of depression,

anxiety, moodiness, anger and sadness. (R. at 457.) Plaintiff indicated that a doctor had

8

prescribed Ativan to treat his anxiety attacks. (R. at 457.) Plaintiff also told Ms. Cole that he had lost his job two years ago and wanted to feel better. (R. at 457.) Plaintiff denied any suicidal or homicidal ideations. (R. at 457.)

On June 3, 2013, Plaintiff returned to Ms. Cole, seeking treatment for bipolar disorder, including medication management and therapy. (R. at 458.) Plaintiff recounted strained relationships with his immediate family — including his parents with whom he lived — and a history of substance abuse. (R. at 459.) Ms. Cole noted Plaintiff's long employment history and that he continued to look for work. (R. at 459.) Plaintiff had no problems with his daily and independent living skills. (R. at 459.) Upon examination, Ms. Cole noted Plaintiff's depressive-like behavior, including anhedonia, feelings of worthlessness and guilt, crying and poor concentration. (R. at 460.) Yet, Plaintiff displayed appropriate attitude and affect, and Ms. Cole described him as "[i]ntelligent" and "[c]reative." (R. at 460.) Plaintiff set goals to remain compliant with his medications and to develop coping skills and eliminate self-destructive behaviors. (R. at 463.)

On June 7, 2013, Plaintiff returned to Nurse Highlander. (R. at 451.) He complained of nightly anxiety/panic attacks, difficulty sleeping and mildly impaired concentration, but he denied suicidal ideations, hallucinations and paranoia. (R. at 452.) Nurse Highlander noted Plaintiff's anxious appearance and poor eye contact. (R. at 452.) She directed him to visit his primary care physician for medication management, but the record does not contain evidence of such a visit. (R. at 451.)

On August 2, 2013, Plaintiff presented to Dr. Vohra at Southside CSB for a medication review and psychiatric follow-up examination. (R. at 465-67.) Plaintiff described feeling "guilty, spikes of energy, depression, no ambition, no motivation . . . and angry with [him]self all

9

[d]ay." (R. at 465.) He had smoked marijuana heavily for twenty-five years, and he quit a few months before. (R. at 465.) Plaintiff claimed that his medications did not work, because he felt "guilty[,] scared and full of negativism." (R. at 465.) Dr. Vohra noted that Plaintiff remained alert and cooperative despite feeling "genuinely frustrated" and sounding "very angry." (R. at 465.) He had normal speech and a depressed mood, as well as fair insight, judgment and fund of knowledge. (R. at 465.) Dr. Vohra found Plaintiff's memory to be "ok" despite his claim that he could not remember anything. (R. at 465.) Dr. Vohra switched Plaintiff to different medications, and directed him to return in one month. (R. at 465.)

Eleven days later, on August 13, 2013, Poplar Springs admitted Plaintiff. (R. at 441-43.) Plaintiff had a plan to commit suicide, because he felt hopeless and helpless. (R. at 441.) He described himself as divorced, unemployed, rejected by his family, and financially strapped. (R. at 441.) Plaintiff remained at Poplar Springs for six days. (R. at 441.) During his hospitalization, Plaintiff took his medications without side effects, and his mood improved — though he still felt frustrated and anxious. (R. at 442.) He continued to have trouble sleeping, but he slept better. (R. at 442.) Plaintiff's condition improved with medication, group psychotherapy, chemical dependency counseling and family intervention. (R. at 442.) Just before discharge, Plaintiff had positive interactions with peers and staff. (R. at 442.)

On September 3, 2013, Plaintiff asked Dr. Vohra to prescribe a different antidepressant. (R. at 468.) However, Plaintiff's depression had improved since Poplar Springs staff increased his dosage of Effexor; therefore, Dr. Vohra simply adjusted the dosage. (R. at 468.) Dr. Vohra noted that Valium and Risperdal helped calm down Plaintiff and control his racing thoughts. (R. at 468.) When Plaintiff could not afford one of his medications, Trileptal, Dr. Vohra and other staff at Southside CSB decided to dispense three of his prescriptions at no charge in hopes that

10

the combination of medications would help. (R. at 468.)  On examination, Dr. Vohra found Plaintiff to be morbidly obese, alert and oriented, with good eye contact, depressed mood and blunted affect. (R. at 468.)

Plaintiff returned to Dr. Vohra on October 29, 2013. (R. at 471.) Plaintiff claimed that he could not fill his prescriptions for nearly three weeks after his previous appointment. (R. at 471.) Plaintiff denied suicidal thoughts, but he felt as depressed as he did when he went into the hospital. (R. at 471.) Dr. Vohra needed Plaintiff to remain on his medications for another four to six weeks to evaluate their effectiveness, and Plaintiff agreed to comply. (R. at 471.) Dr. Vohra's mental status examination of Plaintiff remained unchanged. (R. at 468, 471.)

On December 10, 2013, Plaintiff told Dr. Vohra that "nothing ha[d] changed." (R. at 474.) Dr. Vohra challenged Plaintiff, noting that he had made progress with his counselor (Ms. Cole). (R. at 474.) Plaintiff acknowledged that he no longer felt suicidal, but his attitude, anger and depression persisted. (R. at 474.) Plaintiff complained that he had nothing to do while living with his parents, and he wanted Dr. Vohra's direct phone number. (R. at 474.) Dr. Vohra gave Plaintiff two options. (R. at 474.) First, he could discontinue taking all medications and return to Poplar Springs to try shock therapy. (R. at 474.) Plaintiff rejected this option as too expensive. (R. at 474.) Alternatively, Dr. Vohra recommended adjusting Plaintiff's medications incrementally and closely monitoring for benefits. (R. at 474.) Plaintiff showed willingness to try this second option, and agreed to return to Dr. Vohra in a month. (R. at 474.)

On January 7, 2014, Dr. Vohra's mental examination yielded unchanged, unremarkable results. (R. at 477.) Plaintiff felt less depressed, but he reported feeling angry when around too many people. (R. at 477.) He admitted to drinking alcohol, which Dr. Vohra advised him to cease because of its depressant qualities and proclivity to trigger anxiety. (R. at 477.)

On February 24, 2014, Ms. Cole discharged Plaintiff, noting that he had moved to Northern Virginia and recommending that he continue treatment with Rappahannock Community Services Board ("Rappahannock CSB"). (R. at 515-16.) Ms. Cole described Plaintiff as "currently stable," and she summarized his progress by stating that his depression fluctuated, though he improved most when he took his medications on a regular basis. (R. at 515.) On May 12, 2014, Angela Poythress-Lee, L.P.C., of Southside CSB noted that Plaintiff had returned from Northern Virginia, and he had not taken his medications for "a couple of months." (R. at 559.) The record shows no evidence of treatment from Rappahannock CSB.

Plaintiff resumed therapy with Ms. Cole on June 2, 2014, after moving back home with his parents. (R. at 560-68.) He appeared well-groomed and alert, with average insight, judgment, fund of information and abstract thinking, as well as intact memory. (R. at 564.) Ms. Cole noted visual and auditory hallucinations, because Plaintiff stated that he heard ringing and bells and saw shadowy figures from the corner of his eye. (R. at 564.) Plaintiff displayed depressive-like behavior, but he had an appropriate attitude and affect. (R. at 564.)

On June 17, 2014, Plaintiff resumed treatment with Dr. Vohra. (R. at 569-72.) Plaintiff had returned from Northern Virginia after he could not find work there. (R. at 569.) In addition to ceasing his medications while away, Plaintiff admitted to drinking heavily and ingesting excessive amounts of Valium to calm down. (R. at 569.) Plaintiff recounted his history of violent outbursts and suicide attempts, but he stated that he had learned to walk away instead of fight. (R. at 569.) Dr. Vohra refused to prescribe any benzodiazepines for Plaintiff until he began substance abuse therapy. (R. at 569.) However, Plaintiff's family physician had already prescribed Valium. (R. at 569.) Dr. Vohra noted the same hallucinations that Ms. Cole had two weeks earlier. (R. at 564, 571.) Plaintiff displayed an irritable mood, below average cognition

and poor insight, judgment and concentration.  (R. at. 571.)  Dr. Vohra described Plaintiff as

"[m]inimally [c]ooperative."  (R. at 571.)

These records undercut Dr. O'Keefe's opinion on at least two fronts.  First, of these

records, Dr. O'Keefe only reviewed one of Plaintiff's appointments with Dr. Vohra and

Plaintiff's discharge summary from Poplar Springs.  (R. at 528.)  Dr. O'Keefe did not have the

benefit of the records from other appointments that show that Plaintiff's condition improved

when he complied with his medications and worsened when he did not.  (R. at 457, 468, 474,

477, 515, 559, 569.)  Second, Plaintiff told Dr. O'Keefe that he stopped taking some of his

medications, because he could not afford them.  (R. at 529.)  However, the record shows that

Southside CSB provided several of Plaintiff's medications for free.  (R. at 468, 474.)

Objective medical evidence in the record after Dr. Keefe examined Plaintiff also conflicts

with his opinion.  On July 29, 2014, Plaintiff returned to Dr. Vohra to review his medications.

(R. at 573.)  Hostile and threatening, Plaintiff demanded that Dr. Vohra "fix [his] sleeping

issues."  (R. at 573.)  Plaintiff accused Dr. Vohra of not prescribing enough medication, when in

fact Plaintiff had two refills remaining but never called the pharmacy or Southside CSB to check.

(R. at 573.)  Dr. Vohra urged Plaintiff to pick up all of his medications and to contact Southside

CSB if he had any problems.  (R. at 573.)  Plaintiff's mental status remained unchanged from his

previous visit.  (R. at 571, 573.)  Here again, the record shows that Plaintiff did not take his

medications — not because he could not afford them as he told Dr. O'Keefe — but because he

did not pick them up.  (R. at 529, 573.)

On August 18, 2014, Plaintiff presented to Jeffrey W. Hively, M.D., who prescribed

Ambien and Kenalog, refilled Plaintiff's diazepam prescription, and continued the remainder of

his medication regimen.  (R. at 543.)  Eight days later, Plaintiff returned to Dr. Vohra for

management of his bipolar disorder medications.  (R. at 576-78.)  Plaintiff felt "pretty even keel" with no major symptoms of mood swings, though Dr. Vohra noted that Plaintiff seemed a bit lethargic and sedated.  (R. at 576.)  Dr. Vohra adjusted Plaintiff's medications and directed him to follow-up in two months.  (R. at 576-77.)

On November 12, 2014, Plaintiff returned to Southside CSB.  (R. at 579-81.)  He reported feeling the "same" — he had mood swings, but less severely than before, he took his medications with no side effects, and he continued to have difficulty sleeping.  (R. at 579.)  He raised no concerns, and he indicated that he drank once per month.  (R. at 579.)  On examination, Sabeen Riaz, M.D., described Plaintiff as alert and oriented, with an "ok" mood, blunted affect, as well as poor insight, judgment and concentration.  (R. at 579-80.)  Dr. Riaz advised Plaintiff to find a hobby and exercise.  (R. at 580.)  These records from late 2014, after Dr. O'Keefe had examined Plaintiff, indicate improved symptoms.

On January 7, 2015, Plaintiff had a psychiatric follow-up appointment and medication management session with Dr. Riaz.  (R. at 582-84.)  He had run out of Effexor in December.  (R. at 582.)  Plaintiff felt depressed and angry with low energy, but he denied "true suicidal thoughts."  (R. at 582.)  He had used alcohol a few weeks before, despite medical advice to abstain.  (R. at 582.)  Dr. Riaz made the same mental status findings that she had in November 2014.  (R. at 579-80, 582.)  Again, she advised him to stop drinking and to take his medications. (R. at 582.)  Dr. Riaz did not change Plaintiff's medications, because he would resume his Effexor soon, and Dr. Riaz wanted to closely monitor his progress.  (R. at 582.)

On January 27, 2015, Plaintiff presented to Dr. Hively for bloodwork and a medication refill with "no other complaints."  (R. at 541.)  Dr. Hively adjusted and refilled Plaintiff's medications, and he advised Plaintiff to begin portion control and walking.  (R. at 541-42.)

14

When Plaintiff returned to Dr. Hively on March 17, 2015, he had lost twenty pounds from diet and exercise. (R. at 556.) Plaintiff reported feeling "ok overall," but he experienced increased anxiety when off his medications. (R. at 556.) Dr. Hively noted a normal examination, including that Plaintiff smiled and remained talkative with good eye contact. (R. at 557.)

On April 2, 2015, Dr. Shamim saw Plaintiff to review his medications. (R. at 596-98.) Plaintiff explained that he had not started his higher dosage medications, because they had yet to arrive. (R. at 596.) At times, Plaintiff felt depressed and angry, but he denied any thoughts of suicide and he worked on anger management. (R. at 596.) Plaintiff kept himself busy around the house with "handyman work" and exercise. (R. at 596.) He still saw dark objects out of the corner of his eye and heard negative voices, but he recognized them as "just voices." (R. at 596.) Dr. Shamim found that treatment had helped to control Plaintiff's mood, hallucinations and insomnia without side effects. (R. at 596.) Otherwise, Dr. Shamim's examination notes remained the same. (R. at 596.) By his next visit on June 16, 2015, Plaintiff became compliant with his medications. (R. at 600.) He still felt depressed and angry "at times," but he had learned to control his anger. (R. at 600.) Again, Dr. Shamim made the same findings upon his mental examination. (R. at 596, 600-01.)

On August 20, 2015, Dr. Shamim noted largely similar findings with some improvement. (R. at 600, 603.) Plaintiff remained compliant and felt stable, not depressed or manic. (R. at 603.) He acknowledged that he had low motivation, but he continued to control his occasional anger. (R. at 603.) Dr. Shamim continued Plaintiff on the same medications, and he added a Wellbutrin trial to treat Plaintiff's depression. (R. at 603-04.)

During his last appointment of record on October 15, 2015, Plaintiff felt sad and down, because a very close friend of his had recently died. (R. at 606.) Dr. Shamim noted that Plaintiff

heard voices telling him to hurt other people, but he understood the consequences and would not act on them. (R. at 606.) He denied suicidal and homicidal ideations. (R. at 606.) Otherwise, Dr. Shamim's treatment notes remained the same. (R. at 603, 606.) Plaintiff still spent most of his time at home, keeping busy with handyman work. (R. at 606.) Despite poor judgment, insight and concentration, Plaintiff remained alert with a grossly intact memory. (R. at 606.) Dr. Shamim assessed Plaintiff as a low to moderate risk, and he encouraged Plaintiff to exercise and follow a nutritious diet. (R. at 607.)

Again, Dr. O'Keefe did not have the benefits of these records which show some progress in Plaintiff's symptoms, particularly when he complied with his treatment. Dr. O'Keefe opined that Plaintiff could not complete even simple, routine tasks, but Plaintiff busied himself around the house with handyman work and exercise. (R. at 532, 596, 600, 603, 606.) Moreover, Plaintiff felt angry "at times," but he did not have multiple violent outbursts daily as Dr. O'Keefe indicated. (R. at 531, 600, 603.) The medical evidence from 2015 reveals that Plaintiff had learned to control his anger — something Plaintiff had not done when Dr. O'Keefe examined him in July 2014. (R. at 596, 600, 603, 606.)

The reconsideration opinion of state agency expert Aroon Suansilppongse, M.D., further supports the ALJ's assignment of little weight to Dr. O'Keefe's opinion. State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. § 404.1513a(b)(1). Here, the ALJ gave the opinions of the state agency experts the "greatest weight," but he gave Dr. Suansilppongse's mental assessment greater weight than that of the initial state agency expert. (R. at 41.)

16

On July 27, 2014, Dr. Suansilppongse reviewed Plaintiff's medical records from 2013 onward, including the opinion of Dr. O'Keefe. (R. at 89-94, 101.) Unlike Dr. O'Keefe, Dr. Suansilppongse found that Plaintiff could execute short, simple instructions and detailed instructions without significant limitation. (R. at 99.) Dr. Suansilppongse opined that Plaintiff would have moderate limitations completing a normal workday without interruption. (R. at 100.) However, Dr. Suansilppongse noted that Plaintiff could carry out instructions and complete tasks at an acceptable pace. (R. at 100.)

Regarding Plaintiff's social functioning, Dr. Suansilppongse opined that Plaintiff had moderate limitations interacting appropriately with the public, supervisors and peers at work. (R. at 100.) Nonetheless, Dr. Suansilppongse reasoned that Plaintiff could complete tasks if he had limited contact with others. (R. at 100.) Dr. Suansilppongse had a more complete picture of Plaintiff's mental health treatment and history than Dr. O'Keefe. When viewed in conjunction with the overall record, Dr. Suansilppongse's opinion aligns more with the record than Dr. O'Keefe's extreme opinion.

Plaintiff's own statements and that of his mother, Linda Cantrell, further support the ALJ's decision. Plaintiff testified that he received his associate's degree in computer information systems. (R. at 55.) He acknowledged that his medications alleviated his depression, bipolar disorder and anxiety, though he could not drive while medicated. (R. at 57.) Plaintiff stated that he stopped working not because of his conditions but due to a layoff. (R. at 58.) Plaintiff did not trust himself in a crowded environment. (R. at 59.) He could wash his own dishes and fix his own meals, and he helped his mother grocery shop every week. (R. at 60.) Further, he maintained his own personal care. (R. at 59.)

In an adult function report, Plaintiff stated that he "sometimes work[ed] out or walk[ed]," otherwise he spent his days sitting in a recliner and worrying. (R. at 195.) He prepared a written schedule to track his medications and appointments. (R. at 197.) He could drive and enjoyed watching television, exercising on an elliptical machine, playing drums and visiting his children. (R. at 199.) In a third-party function report, Plaintiff's mother indicated that Plaintiff spent most of his time in his room, but would help her if she needed anything. (R. at 223.) Ms. Cantrell stated that Plaintiff had no problems with personal care, kept his room clean, and helped her inside and outside the house as needed. (R. at 224-25.) According to his mother, Plaintiff also enjoyed wood crafting. (R. at 227.) He did not have any friends in the area since moving back home. (R. at 228.) Ms. Cantrell felt that Plaintiff had trouble getting along with others, but he mostly finished what he started and could follow written and spoken instructions well. (R. at 228-29.) Plaintiff's daily activities and interests demonstrate that he retained greater capabilities than Dr. O'Keefe opined.

The objective medical evidence in the record, the opinion of the state agency medical expert on reconsideration and Plaintiff's admitted daily activities support the ALJ's decision to afford little weight to the opinion of Dr. O'Keefe. Consequently, the ALJ did not err.

### 2. Plaintiff's GAF Scores.

Plaintiff also argues that the ALJ erred by assigning little weight to his GAF scores. (Pl.'s Mem. at 8-10.) Dr. Vohra assessed Plaintiff with GAF scores ranging from 40 to 55, and Plaintiff asserts that the ALJ did not sufficiently explain his decision not to afford those scores controlling weight. (Pl.'s Mem. at 8-10.) Defendant responds that the ALJ properly concluded that the GAF scores did not preclude Plaintiff's ability to work. (Def.'s Mem. at 15.) Moreover,

Defendant properly notes that the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") abandoned reference to GAF scores altogether. (Def.'s Mem. at 13.)

The ALJ considered the GAF scores that Dr. Vohra assessed. (R. at 42.) Ultimately, the ALJ noted that a GAF score represents only a snapshot of a claimant's functioning at one specific time, and not a longitudinal indicator. (R. at 42.) Because the GAF scores did not reflect Plaintiff's long-term abilities, the ALJ afforded them little weight. (R. at 42.)

The GAF represents a numeric scale (0 through 100) used by mental health clinicians and physicians to rate the social, occupational and psychological functioning of adults. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000) [hereinafter DSM-IV]. "A GAF score is a snapshot of a person's functioning at a particular point in time, and is not a longitudinal indicator of the person's functioning." *Sutton v. Colvin*, 2016 WL 7426591, at *15 (E.D. Va. Nov. 29, 2016). Notably, the DSM-V has eliminated the use of GAF scores, finding that their use faces criticism due to a "conceptual lack of clarity," and "questionable psychometrics in routine practice." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013).

The Agency still considers GAF scores as opinion evidence that the ALJ must weigh. Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM-13066 (July 22, 2013) *revised as* AM-13066-REV (Oct. 14, 2014). However, the Agency instructs that "GAF score[s are] never dispositive of impairment severity" and should receive little weight unless "well supported and consistent with other evidence in the file." *Id.* Indeed, unless the treatment provider "clearly explains the reasons behind his or her

GAF rating and the period to which the rating applies," a GAF score does not help the ALJ assess a claimant's longitudinal mental functioning. *Id.*

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded to a medical opinion should remain untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Dunn*, 607 F. App'x at 267.

Here, the Court does not find reason in the record to disturb the weight afforded by the ALJ. Dr. Vohra, one of the treating physicians, assigned Plaintiff GAF scores ranging from "40/45" to 50.[2] (R. at 468 (50), 472 (50), 475 (50), 478 (50), 565 (40), 572 (40/45), 574 (45), 577 (45).) Another treating physician, Dr. Shamim, more recently assessed Plaintiff with GAF scores of 45-55. (R. at 600, 603, 606.) Neither physician gave reasons for the respective GAF scores or their applicable timeframes. (R. at 468, 472, 475, 478, 565, 572, 574, 577, 600, 603, 606.) The ALJ explained that GAF scores represent only a "snapshot of a person's functioning at a particular point in time." (R. at 42 (quoting *Brown v. Astrue*, 2008 WL 5455719, at *5, n.6 (W.D. Va. Dec. 31, 2008).) Because the GAF scores did not reflect Plaintiff's long-term abilities, the ALJ afforded them little weight. (R. at 42.)

The evidence detailed above supports the ALJ's decision. Plaintiff set goals for himself and eventually developed coping skills and an ability to control his anger. (R. at 463, 588, 600, 603.) He kept his own medication and appointment schedule, performed handiwork around the

---

[2]     GAF scores of 31-40 indicate either some impairment in reality testing or communication, or major impairment in several areas, including family relations, judgment or mood (*e.g.*, a depressed man who avoids his friends, neglects his family and cannot work). DSM-IV at 34. Scores of 41-50 indicate either serious symptoms (*e.g.*, suicidal ideations) or a serious impairment in social, occupational or school functioning. *Id.* Scores of 51-60 indicate moderate symptoms or moderate difficulty in social functioning. *Id.*

house and had no problems attending to his personal care. (R. at 59, 197, 224, 596, 600, 606.)

Plaintiff routinely denied suicidal or homicidal thoughts, and his condition often improved when

he complied with his medications. (R. at 442, 447, 452, 457, 460, 465, 468, 471, 475, 477, 564,

571, 573, 577, 579-80, 582, 585, 596, 600, 603, 606.) Given the ALJ's explanation, and the

conflict between the GAF scores and the evidence in the record, the Court finds that the ALJ did

not err in affording little weight to the GAF scores.

### B. The ALJ Conducted a Proper *Craig* Analysis.

Next, Plaintiff argues that the ALJ conducted an improper *Craig* analysis. (Pl.'s Mem. at

10-12.) Plaintiff contends that the ALJ contradicted himself by finding (1) that Plaintiff's

"medically determinable impairments could reasonably be expected to cause [his] alleged

symptoms" and (2) that nonetheless, the objective findings "fail[ed] to provide strong support for

. . . [Plaintiff's] allegations of disabling symptoms and limitations." (Pl.'s Mem. at 10-11.)

Defendant responds that Plaintiff misstates the two-step analysis outlined in *Craig*. (Def.'s

Mem. at 21.) Moreover, Defendant argues that substantial evidence in the record supports the

ALJ's evaluation of Plaintiff's subjective complaints. (Def.'s Mem. at 20.)

### 1. Step One.

When evaluating a claimant's subjective symptoms in the context of an RFC

determination, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-

7p; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step requires the ALJ to determine the

existence of an underlying medically determinable physical or mental impairment or

impairments that reasonably could produce the individual's pain or other related symptoms. SSR

96-7p at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at

594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on

Case 3:16-cv-00939-MHL   Document 13   Filed 02/12/18   Page 22 of 29 PageID# 95

all of the relevant medical evidence in the record."). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second step of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595.

At step one, the claimant has a threshold obligation to show the existence of a medical impairment reasonably likely to cause the pain alleged. *Craig*, 76 F.3d at 595. This yes or no question hinges on the existence of a medical impairment, not the amount of pain claimed, based on objective medical evidence. *See id.* at 594-95 (explaining the fundamental difference between evidence of pain and evidence of a medical condition). Only after the claimant meets this threshold obligation will the ALJ progress to step two and evaluate the intensity and persistence of the claimant's symptoms. *Id.*

Here, the ALJ set forth the two-step *Craig* analysis at the outset of his explanation for the RFC. (R. at 35.) At the first step, the ALJ found that Plaintiff had cleared the threshold, finding that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. at 36.) Indeed — as Plaintiff acknowledges — he received a favorable finding at step one. (R. at 36; Pl.'s Mem. at 11, n.7.) The ALJ then proceeded to step two. Thus, Plaintiff can point to no harm that he incurred from ALJ's analysis at step one.

### 2. Step Two.

At the second step of the *Craig* analysis, Plaintiff argues that the ALJ contradicted his step one finding by concluding that the objective evidence failed to strongly support Plaintiff's allegations of disability. (Pl.'s Mem. at 11.) Defendant responds that Plaintiff misinterprets *Craig*, and that substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 20-21.)

At the outset, Plaintiff's argument that the ALJ contradicted himself during the two-step *Craig* analysis falls flat. First, Plaintiff states that the ALJ's favorable finding at step one means that objective medical evidence has demonstrated a reasonable likelihood that Plaintiff's impairments could cause his symptoms in "the amount and degree alleged." (Pl.'s Mem. at 11 (emphasis removed).) But, Plaintiff conflates reasonable likelihood with absolute certainty, arguing that objective medical evidence cannot ultimately undermine Plaintiff's subjective complaints. (Pl.'s Mem. at 11.) In fact, at step two, *Craig* requires an ALJ to evaluate a claimant's subjective statements and "all available evidence," including the claimant's medical history, laboratory findings and any objective medical evidence of the intensity and persistence of the claimant's symptoms. *Craig*, 76 F.3d at 595. *Craig* does not mandate that objective medical evidence cut in Plaintiff's favor at step two simply because the ALJ made a favorable finding at step one. Consequently, the ALJ did not contradict his step one finding. Nonetheless, the Court will review the ALJ's credibility determination at step two.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems. Inc.*, 717 F.2d 141,145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations do not alone provide conclusive evidence that he suffers from a disability. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591. The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to those statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.[3]

Here, the ALJ found Plaintiff's statements "not fully credible." (R. at 36.) The ALJ explained that the objective medical evidence "fail[ed] to provide strong support for . . . [Plaintiff's] allegations of disabling symptoms and limitations." (R. at 36.) Following these findings, the ALJ conducted a thorough review of Plaintiff's statements and the medical evidence of record. (R. at 36-40.) The ALJ discussed Plaintiff's testimony that he stopped working due to a layoff — not because of his conditions. (R. at 36, 40.) Nonetheless, Plaintiff stated that he could not work, because he could not drive himself to work, did not trust himself in crowds, and felt that he would have problems getting along with co-workers or destroying property. (R. at 36.) The ALJ noted that the medical record showed no evidence of physical disability. (R. at 40.) The ALJ also found that Plaintiff's mental health impairments pre-existed

---

[3]     On March 16, 2016, the Agency issued SSR 16-3p, which rescinded and superseded SSR 96-7p, eliminating the credibility finding at issue here. Plaintiff filed his claim on May 7, 2013, before SSR 16-3p took effect. (R. at 163.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting the Agency retroactive rulemaking power). Because the SSR does not have retroactive effect, the Court will review the ALJ's decision under SSR 96-7p.

his alleged onset of disability and had not previously prevented him from working. (R. at 40.)
Beyond his hospitalization in 2013, Plaintiff received routine, conservative treatment with
minimal objective findings. (R. at 40-41.) Finally, the ALJ addressed the relative effectiveness
of Plaintiff's medications but also his repeated noncompliance with treatment. (R. at 40-41.)
For these reasons, the ALJ found that the objective medical evidence did not fully support
Plaintiff's subjective complaints. (R. at 36-41.)

The objective medical evidence detailed above supports the ALJ's credibility
determination. According to the record, Plaintiff's mental impairments significantly predate his
alleged onset of disability and overlap with his past relevant work. (R. at 457 (treated for mental
health issues between 2003 and 2005), 459 (prescribed mood stabilizers in 2003), 573 (diagnoses
of depression and bipolar disorder since 2003).) Healthcare providers treated Plaintiff's mental
health symptoms primarily with medication and therapy. (R. at 446, 451, 457-59, 463, 465-66,
468-69, 471-72, 474-75, 477-78, 515, 541-43, 550-65, 569-608.) During his 2013
hospitalization, Plaintiff received treatment for his suicidal thoughts, but by the time of
discharge, his condition had improved and he had positive interactions with peers and hospital
staff. (R. at 441-42.) Plaintiff's treatment providers noted improvement of his symptoms on
medication. (R. at 468, 477, 515, 550, 576, 579, 600, 603, 606.) Despite the progress that he
made when taking his medication, Plaintiff had repeated instances of noncompliance that
exacerbated his condition. (R. at 556, 559, 569, 573, 582, 585, 588, 596.) This evidence
sufficiently supports the ALJ's credibility determination.

A thorough review of the ALJ's decision and the record reveals that substantial evidence
supports the ALJ's determination regarding Plaintiff's credibility. Therefore, the ALJ did not err
at step two of the *Craig* analysis.

### C. The RFC Adequately Accounted for Plaintiff's Anger.

Finally, Plaintiff argues that the ALJ failed to sufficiently account for his anger in the RFC. (Pl.'s Mem. at 7-8.) Specifically, Plaintiff alleges that his anger precludes him from working, because the VE testified that "[a]nger won't be tolerated." (Pl.'s Mem. at 7-8.) Defendant responds that the ALJ appropriately addressed Plaintiff's anger by restricting him to infrequent interaction with co-workers, supervisors and the public. (Def.'s Mem. at 16-18.)

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. § 404.1545(b)-(d). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis in the claimant's credible complaints. § 404.1545(e). In making RFC determinations, the ALJ must consider all relevant medical evidence and medical opinions. §§ 404.1527(b)(c) (2013), 404.1545(a)(3). The assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations. SSR 96-8p.

In fashioning the RFC, the ALJ found that Plaintiff could only "interact infrequently with coworkers, supervisors, and the public." (R. at 35.) The ALJ considered Plaintiff's testimony that he did not trust himself in crowds and he felt that he would struggle to get along with co-workers. (R. at 36.) Then, the ALJ reviewed the medical evidence of record. (R. at 37-40.) The ALJ discussed several instances when medical providers noted that Plaintiff felt or sounded angry. (R. at 37-40.) The ALJ noted that in January 2014, Plaintiff told Dr. Vohra that he

recently felt angry waiting in a long line. (R. at 38, 477.)  However, Plaintiff admitted that he

had consumed alcohol, and Dr. Vohra urged sobriety because of its depression and anxiety-

inducing effects. (R. at 38, 477.)  The ALJ observed that in June 2014, Plaintiff had "learned to

walk away" to avoid violent outbursts. (R. at 38, 569.)  Between April and August 2015 — as

noted by the ALJ — Plaintiff could control his anger when he still felt it. (R. at 40.)  The ALJ

found that Plaintiff had received routine and conservative treatment (aside from his

hospitalization in 2013). (R. at 41.)  Despite the fact that medications improved Plaintiff's

mental health symptoms, the ALJ noted Plaintiff's noncompliance with his treatment. (R. at 41.)

The objective medical evidence detailed above supports the ALJ's determination that

Plaintiff retained some capacity to work despite his anger.  From May 2013 until the hearing

before the ALJ in late 2015, Plaintiff at times reported his anger to his treatment providers. (R.

at 457, 465, 474, 477, 582, 596, 600, 603.)  During many appointments, however, Plaintiff did

not mention feeling angry or experiencing outbursts. (R. at 446-47, 451-52, 459-60, 468, 471-

72, 556-57, 564, 576, 579-80, 606-07.)  When he did, the record shows that Plaintiff's condition

improved with treatment, including therapy and medication.  For example, on June 17, 2014, he

acknowledged that he had learned how to walk away and avoid fighting. (R. at 569.)  In March

2015, Plaintiff's primary care physician, Dr. Hively, noted that Plaintiff felt "ok overall," and

during his appointment, he smiled, remained talkative and maintained good eye contact. (R. at

556-57.)  In fact, Plaintiff never complained of anger to Dr. Hively. (R. at 541, 543, 550-58.)

On April 2, June 16 and August 20, 2015, Dr. Shamim noted that Plaintiff had developed ways

to control his anger. (R. at 596, 600, 603.)

Plaintiff highlights his intermittent explosive disorder diagnosis from Dr. Vohra as

evidence that the ALJ formulated an RFC that failed to account for Plaintiff's anger. (Pl.'s

Mem. at 7-8.)  Although correct that he maintained this diagnosis throughout his treatment with Southside CSB, Plaintiff's argument fails.  The notes from Dr. Vohra, Dr. Riaz and Dr. Shamim do not indicate any specific treatment for or emphasis on intermittent explosive disorder.  (R. at 572, 574, 577, 580, 582, 585, 596, 600, 603, 606.)  Instead, as detailed above, Plaintiff's doctors adjusted his medications (which improved his symptoms when he consistently complied) and encouraged sobriety, hobbies and exercise to improve his condition.

Based on Plaintiff's subjective statements, Dr. O'Keefe noted that Plaintiff experienced regular anger outbursts two to three times per day.  (R. at 530, 532.)  As analyzed above, substantial evidence supports the ALJ's decision to afford little weight to Dr. O'Keefe's opinion. Moreover, no treating physician ever found that Plaintiff's anger manifested with such frequency.  Instead, Dr. Shamim referred generally to Plaintiff feeling angry "at times."  (R. at 596, 600, 603.)

Plaintiff's own statements further support the ALJ's decision to limit his interaction with others in the workplace to accommodate his anger.  Plaintiff did not testify explicitly about his anger, but he stated that he did not "trust [him]self in a crowded environment" for fear of snapping at a co-worker or destroying property.  (R. at 59.)  In his function report, Plaintiff stated that he could no longer tolerate groups of people, and he cited his anger as a reason that he struggled to get along with others.  (R. at 196, 200.)  The ALJ restricted Plaintiff to infrequent interaction with supervisors, co-workers and the public, directly addressing Plaintiff's own concerns for his anger.  (R. at 35.)

The record does not demonstrate that Plaintiff possessed such pervasive anger as Plaintiff argues.  The objective medical evidence and Plaintiff's statements support the ALJ's decision to

account for Plaintiff's anger in the RFC by limiting him to no more than infrequent interaction with others. Because substantial evidence supports this limitation, the ALJ did not err.

V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) and Motion to Remand (ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge M. Hannah Lauck and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  February 12, 2018